**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ARNOLD AUSTIN,<br><br>   *Plaintiff*,<br><br> v.<br><br>WASHINGTON METROPOLITAN AREA<br>TRANSIT AUTHORITY, *et al.*,<br><br>   *Defendants*. | No. 19-cv-2718 (DLF) |
| WAYNE MORGAN,<br><br>   *Plaintiff*,<br><br> v.<br><br>WASHINGTON METROPOLITAN AREA<br>TRANSIT AUTHORITY, *et al.*,<br><br>   *Defendants*. | No. 19-cv-2815 (DLF) |

## <u>MEMORANDUM OPINION</u>

Plaintiffs Arnold Austin and Wayne Morgan bring these consolidated actions against their employer, Washington Metropolitan Area Transit Authority (WMATA) and its officers, Paul J. Wiedefeld, John Kuo, Amy Espy-Smith, and Zena R. Carter. Austin and Morgan allege that the defendants discriminated against them based on their medical disabilities, in violation of the Rehabilitation Act, the Family and Medical Leave Act, and 42 U.S.C. § 1983. Before the Court are the defendants' four motions to dismiss, or in the alternative, motions for summary judgment, Dkt. 16 (Defs.' First Mot. Re Austin); Dkt. 20 (Defs.' First Mot. Re Morgan); Dkt. 32

(Defs.' Second Mot. Re Austin); Dkt. 33 (Defs' Second Mot. Re Morgan).  For the reasons that follow, the Court will grant the defendants' motions.

## I.      BACKGROUND

### A.      Arnold Austin

Austin, a 62-year-old WMATA train operator, suffered an allergic reaction on April 10, 2019.  Defs.' First Statement of Facts Re Austin, Dkt. 16-2; Austin's First Statement of Facts ¶ 1, Dkt. 22-1.  That day, he was admitted to the emergency room at Howard University Hospital and stayed four days.  Defs.' First Statement of Facts Re Austin ¶ 2; Austin's First Statement of Facts ¶ 2.[1]

On April 22, 2019, WMATA's Office of Occupational Health and Wellness (OHAW) conducted a return-to-duty medical exam "to determine if [Austin] was medically fit to be returned to work."  Defs.' First Statement of Facts ¶ 6.[2]  The medical office had earlier requested that Austin sign medical records releases to allow it to access his medical records from Howard University Hospital and his nephrologist, Dr. Babak Razi, to assess whether he could "safely perform the essential functions of the train operator position."  *Id*. ¶ 4.  Even though Austin signed the records release form, *id*. ¶ 5, WMATA's medical office did not yet possess the

---

[1] Austin was on FMLA leave during the entire period at issue.  It appears that WMATA granted Austin "A Block of FMLA Leave" from November 21, 2018 to May 22, 2019.  *See* Defs.' First Mot. Re Austin Ex. 18.  In addition, Austin was on intermittent FMLA leave from May 22, 2019 to November 22, 2019 and during this period, he could "take leave periodically 3-4 times per year" and "1 time per month for flare ups" in order to visit his physician, as well as "5-10 times per 6 month[s] lasting up to 10 days per episode for flare ups."  *Id*. Ex. 14.

[2] For a number of the facts set forth by the defendants, the plaintiffs' responses do not indicate whether each plaintiff disputes the fact in question, but instead assert a separate fact.  Thus, in accordance with Local Rule 7(h)(1), the Court will consider these facts uncontroverted and "assume that facts identified by the moving party in its statement of material facts are admitted."  The Court will specifically indicate if a fact is disputed.

records at the time of the exam, *id*. ¶ 9.  During this exam, Austin indicated on a form for the

first time that he had HIV/AIDS.  *See id*. ¶ 8; Defs.' First Mot. Re Austin, Ex. 4 at AA142,

AA173 AA197, AA205 (Austin's Medical Docs.), Dkt. 16-3.

Austin asserts that, at some point, he gave WMATA's medical office notes from his

treating physicians that indicated he could return to work.  *See* Austin's First Statement of Facts

¶ 6; Austin's Opp'n to Defs.' First Mot. Re Austin (Austin's First Opp'n) Ex. B, Dkt. 22-3; *id*.

Ex. C, Dkt. 22-3; *id*. Ex. D, Dkt. 22-3; *id*. Ex. E, Dkt. 22-3.[3]

On April 26, Austin "came to [the Office of Occupational Health and Wellness] and was

upset that WMATA had not received Dr. Razi's medical records."  Defs.' First Statement of

Facts ¶ 11.  WMATA asked Austin for a copy of the records that he had in his possession, but he

refused to provide them.  Defs.' First Statement of Facts ¶ 11.  On June 19, WMATA contacted

Dr. Razi about the records.  *See* Defs.' First Statement of Facts ¶ 13.  Dr. Razi told WMATA that

Austin's "HIV is in very bad shape" and that Austin had declined treatment for it in the past.

Defs.' First Statement of Facts ¶ 13.  Dr. Razi's medical records showed that Austin had "acute

renal failure/acute tubular necrosis" that was improving.  *See* Defs.' First Statement of Facts ¶

14; Austin's First Statement of Facts ¶ 14.  The records also showed that Austin had high levels

of protein in his urine, or proteinuria, which was most likely HIV-related.  *See* Austin's Medical

Docs. at AA77.  Dr. Razi noted that Austin had not seen an infectious disease doctor since

leaving the hospital.  Defs.' First Statement of Facts Re Austin ¶ 17; Austin's First Statement of

Facts ¶ 17.

---

[3] It is unclear exactly when Austin showed WMATA these doctors' notes.  In his statement of facts, Austin does not specify the date, but several of the doctors' notes he cites to are dated after April 22, 2019, the date of Austin's return-to-work examination.  *See* Austin's First Statement of Facts ¶¶ 6, 9.

Austin's HIV and chronic kidney disease are "serious medical conditions that substantially limit several of [Austin's] major life activities—including, immune function, kidney function, endocrine function, urinary function, nerve function, tissue function and muscle function." Defs.' First Statement of Facts Re Austin ¶ 18; Austin's First Statement of Facts ¶ 18. Austin's "acute renal failure/acute tubular necrosis" involve symptoms such as "shortness of breath, fatigue, confusion, nausea, weakness, irregular heartbeat, chest pain or pressure, and seizures or coma (in severe cases)." Defs.' First Mot. Re Austin Ex. 3 ¶ 14 (First Espy-Smith Decl. Re Austin), Dkt. 16-3; Defs.' First Statement of Facts Re Austin ¶ 15.

On July 3, 2019, WMATA asked Austin to provide medical records from his infectious disease provider, Dr. Amirali Amjadi. Defs.' First Statement of Facts Re Austin ¶ 19. Dr. Amjadi's records stated that "it is not safe for Mr. Arnold Austin to operate until his condition becomes under control." *Id.* ¶ 20. On August 1, 2019, a member of the WMATA medical team called Austin and informed him that based on his chronic medical conditions, he "is going to be medically disqualified at this time," effective July 31, 2019. *Id.* ¶ 21. Austin told WMATA that he planned to "seek a second opinion regarding this condition" with a doctor at The Johns Hopkins Hospital. *Id.* ¶ 21. The WMATA employee responded that "if this condition should improve dramatically, we would review and at that point, we could rescind the disqualification if appropriate." Austin's Medical Docs. at AA30.

WMATA sent Austin a letter on August 5 notifying him that he had been disqualified from the position of Train Operator and advising him that he may be eligible for an ADA accommodation or an FMLA leave. *Id.* at AA609; *see also* Defs.' First Statement of Facts ¶ 23. On August 6, WMATA sent Austin a letter notifying him that he could be eligible for the ADA reassignment process. *Id.* ¶ 24. On August 12, Austin sent WMATA his resume to "begin the

process of me being considered for reassignment." *Id.* ¶ 25.  He also said he was "in the process

of attempting to be qualified for my position of train operator."  *Id.*

Austin filed this complaint on September 11, 2019.  *See* Compl., Dkt. 1.  On September

24, WMATA personnel spoke with Dr. Sara Karaba at The Johns Hopkins Hospital, from whom

Austin was getting a second opinion on whether he could return to work.  Defs.' First Statement

of Facts ¶ 27.  Dr. Karaba stated that Austin was being treated for HIV, and that she "does not

see any reasons why he is unable to [return to duty] at this time."  Austin's Medical Docs. at

AA29; *see also* Defs.' First Statement of Facts ¶ 27.  Dr. Karaba said she would send WMATA

Austin's medical records, and the WMATA official responded that after it reviewed these

records, Austin would be scheduled for a return-to-duty medical evaluation.  *Id.*  On October 3,

WMATA rescinded Austin's medical disqualification, *id.* ¶ 29, and it began the process of

returning Austin to work, pending a verification of his drug testing results, *id.* ¶ 30.

### B.    Wayne Morgan

Morgan worked at WMATA as an Equipment Operator D, and later an Equipment

Operator C, until November 25, 2019.  *See* Defs.' First Statement of Re Morgan ¶ 1, Dkt. 20-2;

Morgan's First Statement of Facts ¶ 1, Dkt. 23-1; Morgan Decl. ¶ 5, Dkt. 23-4.  Morgan has been

diagnosed with chronic obstructive pulmonary disease, atrial fibrillation (AFib), and obstructive

sleep apnea.  *See* Defs.' First Statement of Facts Re Morgan ¶ 2; Morgan's First Statement of

Facts ¶ 2.

Morgan's conditions "are physical impairments that substantially limit several of his

major life activities including, but not limited to, his immune function, cognitive function,

respiratory function, heart function and muscle function."  *See* Defs.' First Statement of Facts Re

Morgan ¶ 3; Morgan's First Statement of Facts ¶ 3.  Chronic obstructive pulmonary disease is a

"long-term lung disease that makes it difficult for the individual to breathe," and can cause heart

attacks. Defs.' First Statement of Facts Re Morgan ¶ 6; Defs.' First Mot. Re Morgan Ex. 3 (First

Espy-Smith Decl. Re Morgan) ¶ 18, Dkt. 20-7. Symptoms include "shortness of breath while

being active and low energy." Defs.' First Statement of Facts Re Morgan ¶ 6. AFib is "a

quivery, fluttery heartbeat in which the heart does not have its normal rhythm." Defs.' First

Statement of Facts Re Morgan ¶ 4. A person with AFib is "more likely to have heart failure" and

blood can "pool inside the heart and form blood clots," which could lead to a stroke. *Id*.

Symptoms of AFib include heart palpitations, confusion, dizziness, fainting, weakness, and

fatigue. *Id*. Sleep apnea is "a respiratory disorder that occurs when a person's breathing is

interrupted and/or stopped during sleep" that may deprive the brain of sufficient oxygen. Defs.'

First Statement of Facts Re Morgan ¶ 5; First Espy-Smith Decl. Re Morgan ¶ 17. Untreated

sleep apnea can cause "high blood pressure, stroke, heart failure, irregular heartbeats, and heart

attacks" and can be responsible for "forgetfulness, sleepiness, lack of energy, sleepiness while

driving, decreased reaction time, decreased visual processing, cognitive dysfunction and motor

vehicles crashes." Defs.' First Statement of Facts Re Morgan ¶ 5. Sleep apnea can be treated

with continuous positive airway pressure (CPAP), in which the individual, while sleeping, wears

a mask that is hooked up to a machine delivering a continuous flow of air. *Id*. Although Morgan

does not contest that he was diagnosed with these medical conditions, he asserts that his

"medical records do not show [he] experienced any of these symptoms as of April 30, 2019."

Morgan's First Statement of Facts ¶¶ 4–6.

But on April 22, 2019, Morgan experienced dizziness and shortness of breath, and he was hospitalized until April 25.[4]  *See* Defs.' First Statement of Facts Re Morgan ¶¶ 7–8; Morgan's First Statement of Facts ¶¶ 7–8.  On April 30, WMATA's medical office conducted a return-to-duty exam for Morgan.  Defs.' First Statement of Facts Re Morgan ¶ 12.  WMATA claims that it could not medically clear Morgan until it received medical records from his primary care provider, and it asked his primary care provider to give an opinion on whether Morgan needed to see a cardiologist.  *Id.* ¶ 13.  Morgan asserts that his treating provider, Dr. Oni Ibukunolu, provided a note saying that he could return to work on April 30, 2019.  *See* Morgan's Opp'n to Defs.' First Mot. Re Morgan (Morgan's First Opp'n) Ex. A, Dkt. 23-3; Morgan's First Statement of Facts ¶¶ 12–13.

On May 2, Morgan visited his primary care physician, Dr. Miranda Wellington.  Defs.' First Statement of Facts Re Morgan ¶ 15.  Her records indicated that Morgan refused to take medication to treat his AFib, and that he unsuccessfully attempted to schedule an appointment with a cardiologist.  *Id.*; *see also* Defs.' First Mot. Re Morgan Ex. 4 at M102 (Morgan's Medical Docs.).  That day, Dr. Wellington wrote Morgan a note saying that he is "good to return to work without restrictions."  Morgan's First Opp'n Ex. F.  On May 14, "in light of Dr. Wellington's plan for [Morgan] to follow up with a cardiologist," WMATA asked Morgan to provide it with medical clearance to return to work from a cardiologist.  Defs.' First Statement of Facts Re Morgan ¶ 16.

---

[4] Morgan was also granted FMLA leave for the period requested.  On March 31, 2019, Morgan requested to take leave under the FMLA for single-day absences three times every two months for flare-ups.  *See* Defs.' First Mot. Re Morgan Ex. 14-1, Dkt. 20-17.  WMATA granted his request on May 17, applying it retroactively from April 25, 2019 to October 25, 2019.  *See id.* Ex. 14-2, Dkt. 20-18; Defs.' First Statement of Facts Re Morgan ¶ 11.

A cardiologist, Dr. Klu Descalzo, subsequently examined Morgan on June 3 and determined that Morgan had severe sleep apnea and was not complying with his AFib treatment. *Id*. ¶ 17; Morgan's Medical Docs. at M147.[5]  Dr. Descalzo gave Morgan a note saying that he was "cleared to go back to work without restrictions."  Defs.' First Statement of Facts Re Morgan ¶ 18; Morgan's First Statement of Facts ¶ 17.  Despite the clearance note, WMATA asserts that it still "needed the medical records" from the cardiologist's examination "to complete its evaluation," and it instructed Morgan to provide those records.  Defs.' First Statement of Facts Re Morgan ¶ 19.

On June 29, WMATA's medical office examined Morgan again.  *Id*. ¶ 20.  At that time, WMATA personnel told Morgan that the note from his cardiologist stated that he "has a history of chronic AFib and that he refuses treatment," and that his medical chart showed he had a history of untreated sleep apnea.  *Id*.  WMATA asserts that it "continued to hold [Morgan] out of work because of his failure to seek treatment for his medical conditions."  *Id*.  On July 23, a health official at WMATA told Morgan that he "needed to start medical treatment" for both his AFib and sleep apnea "in order to be medically cleared to return to duty."  *Id*. ¶ 21.

On August 2, Morgan's cardiologist, Dr. Descalzo, issued another verification of treatment stating that he is "under the care of [the] cardiology department for his Atrial fibrillation and congestive heart failure" and that he is "being followed by [the] pulmonary department for obstructive sleep apnea and chronic obstructive pulmonary disease."  Morgan's First Opp'n Ex. H; *see also* Morgan's First Statement of Facts ¶ 22.  When WMATA's health office examined Morgan again on August 20, Morgan indicated he was still not receiving

---

[5] The defendants' statement of facts incorrectly states that Morgan's primary care provider, Dr. Wellington, examined Morgan on June 3.

treatment for either his AFib or his sleep apnea.  *See* Morgan's Medical Docs. at M107.   The WMATA health official examining him told him that he needed to be "be seen by his cardiologist and discuss treatment options, with pulmonary [treatment] for sleep apnea as well." *Id*.  WMATA also told him that it needed to see his medical records for the treatment of both of these conditions.  *Id*. at M118; *see also* Defs.' First Statement of Facts Re Morgan ¶ 22.  On August 22, 2019, Dr. Descalzo completed a verification of treatment form that said Morgan "finally agreed to start anticoagulation for his atrial fibrillation."  *Id*. ¶ 23.

On August 29, Morgan told WMATA's health office that he was now taking Pradaxa, a treatment for AFib.  *Id*. ¶ 24.  WMATA responded that he still needed to provide either documentation showing that he was complying with continuous positive airway pressure or a letter from his pulmonologist to treat his sleep apnea.  *Id*.  On August 30, Morgan's medical provider completed a verification of treatment form stating that he was referred to the sleep clinic to start treatment.  *See id*. ¶ 25.

A WMATA health official conducted another return-to-duty examination on Morgan on October 2, 2019 and cleared Morgan to return to duty pending a drug test.  *Id*. ¶ 26.  But Morgan failed to provide an adequate urine sample over the three hours he was allotted to take the test. Defs.' Second Statement of Facts Re Morgan ¶ 10, Dkt. 32-3.  When this so-called "shy bladder" situation occurs, WMATA guidance states that "the donor can, within 5 business days of the test, provide the MRO with documented, medical proof from an approved, licensed physician that justifies the insufficient urine sample."  Defs.' Second Mot. Re Morgan Ex. G § 5.05(b)(9) (WMATA Drug and Alcohol Policy and Testing Program), Dkt. 32-9.  Dr. Espy-Smith, WMATA's Chief Medical Officer, gave Morgan a "Referral for 'Shy Bladder' Evaluation" that a medical provider could complete to substantiate that Morgan had a medical condition that

prevented him from providing a sufficient amount of urine.  Defs.' Second Statement of Facts Re Morgan ¶ 13.

On October 4, Dr. Espy-Smith received a medical note from Dr. Jarita Hagans who stated that Morgan takes a "fluid pill [called Fuorsemide] and has to urinate a lot after taking" it, which may "decrease his ability to urinate on demand."  *Id*. ¶ 14.  Dr. Espy-Smith asserts that this note did not make sense to her because Furosemide is "a diuretic that is used to reduce extra fluid in the body," and diuretics typically cause "a person to make more urine."  Defs.' Second Mot. Re Morgan Ex. B ¶¶ 16–17 (Second Espy-Smith Decl. Re Morgan), Dkt. 32-4.  In her view, Morgan's medication should therefore have caused him "to urinate a sufficient amount when he was given the drug test."  *Id*. ¶ 17; *see also* Defs.' Second Mot. Re Morgan Ex. F. (WMATA Medical Review Officer e-Verification Worksheet), Dkt. 32-8.

Dr. Espy-Smith attempted to contact Dr. Hagans on the phone to discuss the issue, Defs.' Second Statement of Facts Re Morgan ¶ 21, and instead spoke with Morgan's primary care provider, Dr. Wellington, on October 16, *id*. ¶ 23.  Dr. Hagans had been treating Morgan because Dr. Wellington was on maternity leave.  *Id*. ¶ 24.  Dr. Wellington said that Morgan "had no medical condition that would explain his inability to provide urine," and that his diuretics "should allow him easily to provide a specimen in 3 hours."  Second Espy-Smith Decl. Re Morgan ¶ 20; *see also* Defs.' Second Statement of Facts Re Morgan ¶¶ 26–27.  WMATA concluded that Morgan had failed to provide WMATA with sufficient proof that justified the insufficient urine sample, so it was deemed a "refusal to test," which WMATA considers a "verified positive test result."  *Id*. ¶ 29.  Morgan had previously been found to have refused to take a drug and alcohol test on October 29, 2018, when "he presented to OHAW with the smell of alcohol on his breath," resulting in a positive test result.  *Id*. ¶ 31; Morgan's Second Statement

of Facts ¶ 31, Dkt. 41.  Because Morgan had two positive test results within three years,

WMATA automatically terminated him.  *See* Defs.' Second Statement of Facts Re Morgan ¶ 30.

### C.      Procedural History

On September 11, 2019, Austin filed this suit against WMATA, its General Manager,

Paul J. Wiedefeld; its Chief of Internal Business, John Kuo; its Chief Medical Officer, Amy

Espy-Smith; and one of its Health and Wellness physicians, Zena Carter.  *See* Compl.  Morgan

filed suit against the same five defendants on September 19, 2019, and his case was consolidated

with Austin's on October 29, 2019.  *See* October 29, 2019 Minute Order.  The defendants filed

motions to dismiss, or in the alternative, motions for summary judgment in response to both

complaints.  *See* Dkt. 16, Dkt. 20.  On January 2, 2020, Morgan amended his complaint, *see* Dkt.

28, and on January 13, 2020, Austin amended his complaint, *see* Dkt. 31.  The defendants filed

two new motions to dismiss, or in the alternative, motions for summary judgment, in response to

the new allegations in the amended complaints, *see* Dkt. 32; Dkt. 33, and requested that they be

permitted to incorporate by reference the arguments in their original motions to dismiss.  *See*

Defs.' Second Mot. Re Austin at 2; Defs.' Second Mot. Re Morgan. at 2.

## II.     LEGAL STANDARDS

### A.      Motion to Dismiss

#### 1.      *Rule 12(b)(1)*

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a party may move to

dismiss an action or claim when the court lacks subject-matter jurisdiction.  Fed. R. Civ. P.

12(b)(1).  A motion for dismissal under Rule 12(b)(1) "presents a threshold challenge to the

court's jurisdiction."  *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).  Federal district

courts are courts of limited jurisdiction, and it is "presumed that a cause lies outside this limited

jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Thus, "the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence." *Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d 48, 53 (D.D.C. 2011) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

"When ruling on a Rule 12(b)(1) motion, the court must treat the complaint's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Jeong Seon Han v. Lynch*, 223 F. Supp. 3d 95, 103 (D.D.C. 2016) (internal quotation marks omitted). Those factual allegations, however, receive "closer scrutiny" than they would if the court were considering a Rule 12(b)(6) motion for failure to state a claim. *Id.* Also, unlike in the Rule 12(b)(6) context, a court may consider documents outside the pleadings to evaluate whether it has jurisdiction, but it still must "accept all of the factual allegations in [the] complaint as true." *See Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (internal quotation marks omitted). If, at any point, the court determines that it lacks jurisdiction, the court must dismiss the claim or action. Fed. R. Civ. P. 12(b)(1), 12(h)(3).

### 2.    *Rule 12(b)(6)*

Rule 12(b)(6) allows a defendant to move to dismiss the complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard does not amount to a specific probability requirement, but it does require "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint need not contain "detailed

factual allegations," but alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility." *Id.* (internal quotation omitted).

Well-pleaded factual allegations are "entitled to [an] assumption of truth," *id.* at 679, and the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation omitted). But the assumption of truth does not apply to a "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (internal quotation omitted). An "unadorned, the defendant-unlawfully-harmed-me accusation" is not credited; likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Ultimately, "[d]etermining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

### B.    Motion for Summary Judgment

A party may move "for summary judgment at any time," including at the beginning of a case before discovery has commenced. Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986). A "material" fact is one that could affect the outcome of the lawsuit. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). And a dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895. In reviewing the record, the court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or

13

weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

However, "[w]hen opposing parties tell two different stories, one of which is blatantly

contradicted by the record, so that no reasonable jury could believe it, a court should not adopt

that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v.*

*Harris*, 550 U.S. 372, 380 (2007).

It is well-established that "a plaintiff opposing summary judgment" must "substantiate

[his allegations] with evidence" that "a reasonable jury could credit in support of each essential

element of her claims." *Grimes v. District of Columbia*, 794 F.3d 83, 94 (D.C. Cir. 2015).  The

moving party is entitled to summary judgment if the nonmoving party "fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.     ANALYSIS

### A.      Rehabilitation Act Claims Against WMATA (Count I)

Section 504 of the Rehabilitation Act mandates that "[n]o otherwise qualified individual

with a disability in the United States . . . shall, solely by reason of her or his disability, be

excluded from the participation in, be denied the benefits of, or be subjected to discrimination"

by any program receiving federal funding.  29 U.S.C. § 794(a).  Courts apply the standards laid

out in the analogous provision of the Americans with Disabilities Act (ADA) in resolving claims

brought under the Rehabilitation Act.  *See* 29 U.S.C. § 794(d).  The Rehabilitation Act bars

several types of discrimination, including, as relevant here, intentional discrimination and failure

to accommodate.  *See Drasek v. Burwell*, 121 F. Supp. 3d 143, 153–54 (D.D.C. 2015).

Austin and Morgan allege substantially the same violations of Section 504 of the

Rehabilitation Act in Count I.  Both plaintiffs allege that WMATA discriminated against them

by: (1) refusing to allow them to return to work after their physicians "cleared [them] as fit for duty and able to perform the essential functions" of their jobs; (2) failing to offer the plaintiffs reasonable accommodations for their disabilities; and (3) demanding "unfettered access to [their] medical records without regard to the proper scope of any job related business needs."  *See* Austin's Am. Compl. ¶ 42; Morgan's Am. Compl. ¶ 43.

>    1.    *Failure to Accommodate Claims*

The plaintiffs appear to allege that the defendants failed to offer them reasonable accommodations when they refused to allow them to return to work immediately following their return-to-work examinations.[6]  To establish a prima facie case for a failure to accommodate claim under the Rehabilitation Act, a plaintiff must show: (1) he had a disability within the meaning of the statute; (2) the employer had notice of the disability; (3) with reasonable accommodation he could perform the essential functions of the position; and (4) the employer refused to make the requested accommodation.  *Scarborough v. Natsios*, 190 F. Supp. 2d 5, 19 (D.D.C. 2002).  An underlying assumption of any reasonable accommodation claim is that "the plaintiff-employee has requested an accommodation which the defendant-employer has denied." *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999).  Because neither plaintiff plausibly alleges that he made a request for an accommodation, they fail to establish a prima facia case on this ground alone.

---

[6] While the defendants seem to interpret the plaintiffs' claims as intentional discrimination claims, *see* Defs.' First Mot. Re Austin at 12–17; Defs.' First Mot. Re Morgan at 18–23, the plaintiffs fail to respond to the defendants' arguments relating to intentional discrimination, *see* Austin's First Opp'n at 4–14; Morgan's First Opp'n at 4–14.  And Austin asserts that the defendants mistakenly apply the legal standard for intentional discrimination instead of failure to accommodate claims, *see* Austin's Opp'n at 7 n.2.  The Court accordingly reads the amended complaints as setting forth only reasonable accommodation claims, not intentional discrimination claims.  Moreover, for the reasons stated in Part III.A.2, *see infra*, the plaintiffs offer no evidence that the defendants intentionally discriminated against the plaintiffs based on their disabilities.

i.    Austin's Reasonable Accommodation Claims

In his complaint, Austin alleges that "[a]t no time did any of the Defendants offer Plaintiff a reasonable accommodation given his known medical condition that would allow him to perform the essential functions of his job," Austin's Am. Compl. ¶ 29, and that WMATA "fail[ed] to offer Plaintiff a reasonable accommodation for his known disability, perceived disability and/or record of disability," *id*. ¶ 42.  While an employee is not required to put a request for accommodation in writing or "invoke the magic words 'reasonable accommodation,'" he "must make clear that [he] wants assistance with his or her disability so that [he] may return, or continue, to work."  *Badwal v. Bd. of Trustees of Univ. of D.C.*, 139 F. Supp. 3d 295, 313 (D.D.C. 2015) (internal quotation marks omitted); *see also Thompson v. Rice*, 422 F.Supp.2d 158, 176 (D.D.C. 2006) (employer must "be alerted to the condition and the need for accommodation").  Austin's complaint is devoid of any facts supporting his claim that he requested an accommodation from WMATA.

In his brief, Austin appears to argue that he made a request for accommodation when he contacted WMATA to return to his train operator job following his hospitalization.  *See* Austin's First Opp'n at 6.  It is unclear, however, how this could have been a request for accommodation given that the complaint alleges that Austin sought to return to work *without restrictions*.  *See* Austin's Am. Compl. ¶ 15 (alleging that Austin's physician cleared him on April 15 to return to work "*without restrictions*" on April 15, 2019) (emphasis added).  The complaint does not allege that Austin "want[ed] assistance with [his] disability" in order to resume working, *Badwal*, 139 F. Supp. 3d at 313, much less that he desired any particular accommodation.  And "[n]otice of a disability does not ordinarily satisfy the . . . request requirement, which performs the independent function of informing an employer of the limitations imposed by a disability and the nature of the

accommodation needed to remedy those limitations." *Waggel v. George Washington Univ.*, 2020 WL 2296869, at *4 (D.C. Cir. May 8, 2020).

Nonetheless, Austin argues that once WMATA learned of his disability, it had an obligation to "initiate an informal, interactive process with the qualified individual to identify reasonable accommodations." Austin's First Opp'n at 5. An employer's "obligation" to provide accommodations "is only triggered where the employee has actually requested a reasonable accommodation." *Badwal*, 139 F. Supp. 3d at 313; *see also Evans v. Davis Mem'l Goodwill Indus.*, 133 F. Supp. 2d 24, 28 (D.D.C. 2000) (the obligation to engage in an "interactive process" is "only triggered by an affirmative request"). Austin made no such request. Thus, WMATA was not obligated to provide Austin with accommodations. For these reasons, Austin's failure to accommodate claims are dismissed.

    ii.  Morgan's Reasonable Accommodation Claims

Morgan's failure to accommodate claim falls short for similar reasons. Morgan alleges in his complaint that when he presented WMATA's medical office with a return-to-duty certification from his cardiologist on August 22, 2019, WMATA "failed to offer plaintiff Morgan a reasonable accommodation." Morgan's Am. Compl. ¶ 25. He further alleges that WMATA violated the Rehabilitation Act by "failing to offer Plaintiff Morgan a reasonable accommodation for his known disability, perceived disability, and/or record of disability." *Id*. ¶ 43. But, like Austin, Morgan does not plead any specific facts that show he asked WMATA to accommodate his disability, so he too has failed to establish a prima facia case. The Court thus will dismiss his failure to accommodate claims.

2.      *Medical Records*

The Rehabilitation Act incorporates by reference the medical examination confidentiality provision of the ADA.  *Doe v. U.S. Postal Serv.*, 317 F.3d 339, 340 (D.C. Cir. 2003).  That confidentiality provision prohibits an employer from inquiring about employees' medical conditions, except if the "inquiry is shown to be job-related and consistent with business necessity."  42 U.S.C. § 12112(d)(4)(A).  An acceptable inquiry is one that examines "the ability of an employee to perform job-related functions."  42 U.S.C. § 12112(d)(4)(B).  WMATA's requirements that Morgan and Austin pass return-to-duty medical examinations and provide medical records were job-related and consistent with business necessity.

i.      Austin's Medical Records Claim

As a train operator, Austin held a "safety sensitive position."  The Compact for the Washington Metrorail Safety Commission—which oversees WMATA's safety regulatory apparatus—defines a "safety sensitive position" as "any position" that "directly or indirectly affect[s] the safety of the passengers or employees of the WMATA Rail System."  *See* Pub. L. 115–54, § 1(h), 131 Stat. 1094 (2017).  The Federal Transit Administration defines a "safety sensitive function" as "operating a revenue service vehicle, including when not in revenue service."  49 C.F.R. § 655.4.

Train operators are "responsible for controlling trains that safely and efficiently transport customers throughout WMATA's underground, surface and elevated rail systems."  Defs.' First Mot. Re Austin Ex. 7 at 1 (WMATA Train Operator Position Description), Dkt. 16-3.  They also "monitor[] all train operations in revenue and non-revenue service."  *Id*.  WMATA has established that "[t]he train operator position is a safety sensitive position as defined by WMATA."  First Espy-Smith Decl. Re Austin ¶ 13.  All safety sensitive employees are required

to undergo a medical examination, and if this examination is successful, WMATA's medical office issues a "safety sensitive certificate" to confirm that the employee has been cleared to perform safety-sensitive duties. *See* Defs.' First Mot. Re Austin Ex. 8 at 1–2 (WMATA Staff Notice on DOT Medical Certification Requirements), Dkt. 16-3.

Because Austin occupied a safety-sensitive position that involved operating public transit vehicles, subjecting him to a medical examination following a multi-day hospital stay was "job-related and consistent with business necessity." *See Yin v. California*, 95 F.3d 864, 867–69 (9th Cir. 1996) (permitting employer to conduct medical examination under the business necessity exception of the ADA when the employee's health problems caused him to miss days at work); *Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 517 (3d Cir. 2001) (requiring bus driver who missed work due to injured back to undergo a medical examination before returning to work was job-related and consistent with business necessity). The medical examination was also mandated under WMATA policy. Under WMATA's Attendance Policy, an employee who is absent from employment for more than five work days must "report in person to [the Office of Occupational Health and Wellness] for a return-to-duty exam." Defs.' First Mot. Re Austin Ex. 5 (WMATA Attendance Policy § 5.04(j)), Dkt. 16-3. Following his hospital stay for an allergic reaction and kidney issues, *see* Austin's First Opp'n Ex. B at 5, Dkt. 22-3, Austin was absent from employment for more than five days, so WMATA performed a return-to-duty medical examination. WMATA therefore properly conducted the medical examination to evaluate whether Austin could return to work.

Similarly, WMATA's requests for medical records and inquiries with his doctors were both job-related and necessary to determine whether he could operate a train safely. Austin acknowledged during his medical examination that he had kidney disease and that he had

experienced acute renal failure.  Austin's Medical Docs. At AA142–AA143.  He also indicated that he had HIV.  *Id*.  He does not dispute that his HIV and chronic kidney disease are "serious medical conditions" that "substantially limit several of [his] major life activities—including, immune function, kidney function, endocrine function, urinary function, nerve function, tissue function and muscle function."  Defs.' First Statement of Facts Re Austin ¶ 18; Austin's First Statement of Facts ¶ 18.  And there is little question that many of the symptoms associated with acute renal failure—shortness of breath, fatigue, confusion, chest pain, seizures and coma—are severe enough to inhibit Austin's ability "to perform job-related functions" as a train operator.  *See* 42 U.S.C. § 12112(d)(4)(B).  Nonetheless, Austin argues that once he produced notes from his doctors indicating that he was able to return to work, it was unlawful for WMATA to request his medical records.  Austin's First Opp'n at 15.

But the records WMATA requested related directly to Austin's severe kidney condition—a condition that had the potential to impair Austin's ability to operate WMATA trains safely.  The records confirmed that Austin had acute renal failure, *see* Austin's Medical Docs. at AA76–77; that he had proteinuria, or greater than normal amounts of protein in his urine, that was HIV-related, *id.*; and that he had not seen an infectious disease doctor, *id*.  Dr. Razi, Austin's nephrologist, told WMATA personnel that Austin's HIV was in "very bad shape" and could be contributing to his kidney issues.  *See id*. at AA34.  Dr. Amjadi, Austin's infectious disease doctor, stated that it was "not safe for [Austin] to operate until his condition becomes under control."  *Id*. at AA121.  WMATA's request for medical records, including those from Austin's infectious disease provider, were thus job-related and consistent with business necessity.  *See Greer v. O'Neill*, 2003 WL 25653036, at *9 (D.D.C. Sept. 25, 2003) (employer's

demand for medical certificate in response to plaintiff's request for extended sick leave did not violate the Rehabilitation Act).

There is no evidence that WMATA was "simply trying to discover whether [Austin] suffered from a particular disability or that [WMATA] harbored either a special bias against individuals with a given disability or a general bias against all persons with disabilities." *Yin*, 95 F.3d at 868. To the contrary, WMATA was well within its discretion to make medical inquiries and thoroughly investigate health conditions that could impair Austin's ability to function safely and effectively as a train operator. The defendants are thus entitled to summary judgment on Austin's medical records claim in Count I.

ii.     Morgan's Medical Records Claim

For the relevant time period, Morgan was employed by WMATA as an "Equipment Operator D," which involves "operating various pieces of heavy equipment" as well as "operat[ing] Authority vehicles." *See* Defs.' First Mot. Re Morgan Ex. 7 at 1, 3 (WMATA Equipment Operator Position Description), Dkt. 20-10. This position required Morgan to hold a Commercial Driver's License (CDL). *Id*. at 8. Under WMATA rules, to maintain a CDL, an employee must pass a medical examination that provides him or her with a DOT Medical Card certifying he or she has met the physical requirements to operate a commercial motor vehicle. Defs.' First Mot. Re Morgan Ex. 8 at 1 (WMATA Staff Notice on DOT Medical Certification Requirements). The equipment operator is also a "safety sensitive position" as defined by WMATA. *See* First Espy-Smith Decl. Re Morgan ¶ 12.

Morgan's return-to-duty medical examination was job-related and consistent with business necessity. Given Morgan's role as an equipment operator, WMATA properly evaluated him following his April 2019 hospitalization for dizziness and shortness of breath to ensure that

he could adequately perform a safety-sensitive job involving heavy equipment.  His exam was also mandated by regulation.  Like Austin, Morgan was absent from work for more than five days, so he was required to undergo a return-to-duty medical examination to obtain a new DOT Medical Card.  *See* WMATA Attendance Policy § 5.04(j).  Further, Federal Motor Carrier Safety Administration (FMCSA) regulations, upon which WMATA relies when conducting medical evaluations for its CDL employees, *see* First Espy-Smith Decl. Re Morgan ¶ 14, require a driver to submit to a medical examination "[w]hen a driver returns from an illness . . . that interferes with driving ability."  Defs.' First Mot. Re Morgan Ex. 9 at 10 (FMSCA Medical Examiner Handbook), Dkt. 20-12.

In addition, WMATA legitimately held Morgan out of work, despite his medical clearance notes, because he could not perform his job without a valid DOT card.  *See Butler v. Washington Metro. Area Transit Auth.*, 275 F. Supp. 3d 70, 81–83 (D.D.C. 2017) (a driver without a valid DOT Medical Card is not "otherwise qualified" to work).  Simply because Morgan had worked as an equipment operator since 2009, and previously possessed a valid DOT Medical Card, *see* Morgan's First Opp'n at 7–8, did not mean that he was qualified to work as an equipment operator after his extended medical absence.  *Butler*, 275 F. Supp. 3d at 81–82.

WMATA has shown that its inquiry into Morgan's medical records was job-related and consistent with business necessity.  At his April 30, 2019 exam, Morgan indicated that he had AFib, and a "heart issue."  *See* Morgan's Medical Docs. at M165–M167.  Given that Morgan's job as an equipment operator required him to "operat[e] various pieces of heavy equipment" as well as "authority vehicles," *see* WMATA Equipment Operator Position Description, WMATA was justified in seeking additional information following Morgan's hospitalization.  WMATA's request was also consistent with regulations governing equipment operators.  WMATA rules

state that if, at the completion of an examination, "the medical examiner determines that a CDL holder must provide additional medical information or undergo medical treatment in order to determine whether they can receive a DOT card, the CDL holder must provide Medical Services with that additional information within 45 days from the initial examination."  WMATA Staff Notice on DOT Medical Certification Requirements at 1.  And even though Morgan's primary care physician wrote a note saying he could return to work on the day of his exam, *see* Morgan's First Opp'n Ex. A, WMATA properly asked to see the medical records from his treating physicians.  While a medical examiner may "consider any reports and recommendations from the primary care provider and/or specialists treating the driver to supplement your examination and ensure adequate medical assessment," FMCSA Medical Examiner Handbook at 43, an examiner may also delay their determination "pending the receipt of additional information," 49 C.F.R. § 391.43(g)(4).

Finally, WMATA was justified in requiring that Morgan seek treatment for his medical conditions before it cleared him for work.  Medical records from Morgan's primary care physician, Dr. Wellington, indicated that Morgan had AFib and that he had refused anticoagulation for his AFib in the past.  *Id*. at M102.  Records from Morgan's cardiologist, Dr. Descalzo, revealed that Morgan had "severe" sleep apnea and was "not compliant" with continuous positive airway pressure treatment.  *Id*. at M147.  Dr. Descalzo also noted that Morgan had a "[h]istory of noncompliance with medical therapy."  *Id*.

Relevant regulations make clear that the medical conditions identified in Morgan's physicians' reports could substantially impede Morgan's ability to perform his equipment operator job safely.  FMCSA regulations state that an employee is physically qualified to drive a commercial vehicle if he has "no current clinical diagnosis of . . . any other cardiovascular

disease of a variety known to be accompanied by syncope, dyspnea, collapse, or congestive cardiac failure"; no history or diagnosis of "respiratory dysfunction likely to interfere with his/her ability to control and drive a commercial motor vehicle safely"; and no medical history or clinical diagnosis of a condition likely to cause "loss of consciousness or any loss of ability to control a commercial motor vehicle." 49 C.F.R. § 391.41(b)(4), (5), (8).  Sleep apnea is a respiratory dysfunction that can "interfere with oxygen exchange and may result in gradual or sudden incapacitation," FMCSA Medical Examiner Handbook at 117, and AFib is a cardiovascular condition that "can cause a stroke," *id*. at 87–88.

Morgan himself acknowledges that he has chronic obstructive pulmonary disease, AFib, and sleep apnea and that they "substantially limit several of his major life activities including, but not limited to, his immune function, cognitive function, respiratory function, heart function and muscle function."  Defs.' First Statement of Facts Re Morgan ¶ 3; Morgan's First Statement of Facts ¶ 3.  WMATA also was "eminently reasonable" when it required that Morgan demonstrate his sleep apnea was under control, instead of treating his condition as an automatic disqualifier.  *See Butler*, 275 F. Supp. 3d at 82–83 (approving of WMATA's requirement that employee demonstrate his sleep apnea was "under control" with continuous positive airway pressure treatment before it medically cleared him).

By investigating Morgan's medical conditions fully and ensuring that he received appropriate treatment, WMATA acted reasonably and consistently with its regulations and policies.  In sum, WMATA had both the authority and the duty to make sure that Morgan was physically able to perform his job safely before allowing him to return to work as a heavy equipment operator.  *See id*.  Accordingly, the Court grants summary judgment in favor of the defendants on Morgan's medical records claim in Count I.

B.      **FMLA Claims (Counts II & III)**

The FMLA allows eligible employees to take up to 12 work weeks of unpaid leave per

year for: (A) "the birth of a son or daughter . . . in order to care for such son or daughter," (B) the

adoption or foster-care placement of a child with the employee, (C) the care of a "spouse . . . son,

daughter, or parent" with "a serious health condition," and (D) the employee's own serious

health condition when the condition interferes with the employee's ability to perform at work.

29 U.S.C. § 2612(a)(1).  The statute makes it unlawful for an employer to "interfere with,

restrain, or deny the exercise of or the attempt to exercise, any right provided under this

subchapter" and to (2) "discharge or in any other manner discriminate against any individual for

opposing any practice made unlawful."  *Id*. § 2615(a).

The plaintiffs seek damages against both WMATA and the individual defendants for

violating their FMLA rights by failing to provide them with: "an eligibility notice regarding"

FMLA leave, *see* Austin's Am. Compl. ¶ 34; Morgan's Am. Compl. ¶ 37; a "rights and

responsibilities notice," *see* Austin's Am. Compl. ¶ 35; Morgan's Am. Compl. ¶ 38; and a

"designation notice," *see* Austin's Am. Compl. ¶ 36; Morgan's Am. Compl. ¶ 39.  Austin also

alleges that the defendants unlawfully denied his FMLA leave on October 11, 2019 because he

had not worked 1,250 hours within the last twelve months due to their unlawful refusal to let him

return to work.  *See* Austin's Am. Compl. ¶¶ 37–38.[7]

---

[7]  In their briefs, the plaintiffs suggest that they seek injunctive relief under the *Ex Parte Young*
doctrine for their FMLA and § 1983 claims against WMATA, *see* Austin's First Opp'n at 22–23;
Morgan's First Opp'n at 22–23.  But any such claim would fail for two reasons.  First, the *Ex
Parte Young* doctrine does not permit suits against the state.  *Ex Parte Young* held that the
Eleventh Amendment does not bar courts from enjoining state officers, but it relies on "the
fiction that the suit [goes] against the officer and not the State, thereby avoiding sovereign
immunity's bar."  *Vann v. Kempthorne*, 534 F.3d 741, 749 (D.C. Cir. 2008).  Second, even if the
plaintiffs' pleadings request injunctive relief against the individual defendants in their official

1.    *FMLA Claims Against WMATA*

A state is immune from federal suits brought by the state's own citizens or the citizens of another state unless the state waives its sovereign immunity or Congress validly abrogates that immunity.  *See Jones v. WMATA*, 205 F.3d 428, 431–32 (D.C. Cir. 2000).  WMATA originates in a compact signed by Maryland, Virginia, and the District of Columbia, and it enjoys the sovereign immunity of those signatories.  *Id.*

Congress has abrogated states' immunity for FMLA claims relating to the care of a "spouse . . . son, daughter, or parent" with "a serious health condition."  *See Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 723, 740 (2003); 29 U.S.C. § 2612(a)(1)(C).  But Congress has not done so for FMLA claims relating to an employee's own serious health condition when the condition interferes with the employee's ability to perform at work.  *See Coleman v. Court of Appeals of Maryland*, 566 U.S. 30, 43–44 (2012); 29 U.S.C. § 2612(a)(1)(D).  Because Congress has not abrogated the states' immunity for the particular FMLA claims the plaintiffs allege here, sovereign immunity forecloses those claims against WMATA.

2.    *FMLA Claims Against Individual Defendants*

Neither amended complaint specifies whether the plaintiffs are suing the WMATA officials in their official or individual capacities.  *See* Austin's Am. Compl.; Morgan's Am. Compl.  But both plaintiffs argue in their briefs that they are suing the WMATA officials in their individual capacities.  *See* Austin's First Opp'n at 17; Morgan's First Opp'n at 17.  Courts are

---

capacity, neither complaint specifies the type of injunctive relief the plaintiffs seek.  Both plaintiffs request only "immediate employment reinstatement," *see, e.g.*, Austin's Am. Compl. ¶ 66; Morgan's Am. Compl. ¶ 64, but Austin has already been cleared for duty, *see* Defs.' First Statement of Facts Re Austin ¶¶ 29–30, and Morgan was on FMLA leave during the relevant period, *see* Defs.' First Mot. Re Morgan Ex. 14-2.  The Court thus construes both complaints as seeking only damages under the FMLA.

split on whether public employees can be held individually liable for damages under the FMLA. The D.C. Circuit has yet to reach the question, but the Fourth, Sixth, and Eleventh Circuits have concluded that public officials cannot be held individually liable for damages under the FMLA. *See Lizzi v. Alexander*, 255 F.3d 128, 138 (4th Cir. 2001), overruled in part on other grounds by *Hibbs*, 538 U.S. at 740; *Mitchell v. Chapman*, 343 F.3d 811 (6th Cir. 2003); *Wascura v. Carver*, 169 F.3d 683 (11th Cir. 1999).  The Fifth and Eighth Circuits have held the contrary.  *See Modica v. Taylor*, 465 F.3d 174, 184 (5th Cir. 2006) (holding individual liability may exist for public employees under the FMLA); *Darby v. Bratch*, 287 F.3d 673, 681 (8th Cir. 2002) (concluding that a public official may be held individually liable for retaliation in violation of the FMLA).

  This Court agrees with the courts that have held that public officials cannot be held liable for damages in their individual capacities under the FMLA.  State officials acting in their official capacity are entitled to immunity because in such cases the state is the "real, substantial party in interest."  *Lizzi*, 255 F.3d at 136 (quoting *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984)).  Here, as in *Lizzi*, "any actions of the individual defendants were tied inextricably to their official duties," and "the complaint[s] ma[ke] no showing of any ultra vires action taken by any individual employee."  *Id*.  Enabling the WMATA officials to be sued in such circumstances would enable plaintiffs "to evade the Eleventh Amendment prohibition against suing a state merely by naming the individual supervisor as the employer."  *Id*. at 137. The WMATA officials are therefore entitled to immunity from suit, and the FMLA claims against them are dismissed.

C.      **Section 1983 Claims (Counts IV & V)**

The plaintiffs allege that the individual defendants and WMATA "violat[ed] Plaintiff's FMLA rights" and that WMATA "violat[ed] Section 504 of the Rehabilitation Act."  *See* Austin's Am. Compl. ¶¶ 73–74, 83; Morgan's Am. Compl. ¶¶ 70–71, 80.  Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

1.      *Section 1983 Claims Against WMATA*

WMATA cannot be sued under 42 U.S.C. § 1983 because it is not a "person" under the statute.  *See Plater v. D.C. Dep't of Transp.*, 530 F. Supp. 2d 101, 104 (D.D.C. 2008) (collecting cases).  The plaintiffs' citation to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) is inapposite—*Monell* concerned municipalities, and WMATA is an interstate compact, *see supra* Part III.B.1.  Therefore, both plaintiffs' § 1983 claims against WMATA are dismissed.

2.      *Section 1983 Claims Against Individual Defendants*

A state officer can be held personally liable for damages under § 1983 based on actions taken in their individual capacities.  *Hafer v. Melo*, 502 U.S. 21, 31 (1991).  But a plaintiff suing under § 1983 bears the initial burden of showing that the federal statute he claims has been violated creates an individually enforceable right in the class of beneficiaries to which he belongs.  *Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005).  This showing creates a rebuttable presumption that the right is enforceable under § 1983, and the defendant can

overcome "this presumption by demonstrating that Congress did not intend that remedy for a newly created right." *Id.* But "the provision of an express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983." *Id.* at 121.

The comprehensive remedial scheme set forth in the FMLA provides the exclusive remedies for vindicating the rights set forth in that statute.[8]  As the Sixth Circuit held in *Diaz v. Michigan Dep't of Corr.*, 703 F.3d 956 (6th Cir. 2013), the FMLA's remedial provisions are so "comprehensive on their face" that it is clear that Congress intended to exclude other remedies. *Id.* at 963.  Allowing the plaintiffs to bring § 1983 claims against the individual defendants here would allow the plaintiffs to "circumvent sovereign immunity" under the FMLA.  *Id.*  Other courts have reached the same conclusion.  *See, e.g., Kilvitis v. Cty. of Luzerne*, 52 F. Supp. 2d 403, 418–19 (M.D. Pa. 1999); *Jolliffe v. Mitchell*, 971 F. Supp. 1039, 1045 (W.D.Va. 1997); *Coleman v. City & Cty. of Broomfield*, 2005 WL 3527290, at *4 (D. Colo. Dec. 22, 2005).  Accordingly, the Court will dismiss the plaintiffs' § 1983 claims against the WMATA officials.

### D.     Morgan's Retaliatory Termination Claims (Count VI)

Morgan's amended complaint alleges a final, additional count: that all defendants "unlawfully retaliated" against him by terminating his employment after he filed this lawsuit.  He claims that WMATA retaliated against him in violation of the Rehabilitation Act, *see* Morgan's Am. Compl. ¶ 94, and that both the individual defendants and WMATA retaliated against him in violation of the FMLA and § 1983, *see id.* ¶¶ 95–98.

---

[8] The plaintiffs appear to allege that the individual defendants violated only the FMLA, not the Rehabilitation Act.  *See* Austin's Am. Compl. ¶ 73; Morgan's Am. Compl. ¶ 70.  But the Court notes that the Rehabilitation Act's comprehensive remedial scheme also would preclude a more expansive remedy under § 1983.  *See Costabile v. New York City Health & Hosps. Corp.*, 951 F.3d 77, 83 (2d Cir. 2020).

Morgan's FMLA retaliation claims against WMATA are barred by sovereign immunity, *see supra* Part III.B.1, as are his FMLA claims for damages against the individual defendants, *see supra* Part III.B.2.  Morgan's § 1983 retaliation claims against WMATA and the individual defendants also fail for the reasons stated above, *see supra* Part III.C.1.–2.  Thus, the Court considers Morgan's retaliation claim only to the extent that it alleges a Rehabilitation Act claim against WMATA, or a FMLA claim for injunctive relief against WMATA's officers, *see Ex Parte Young*, 209 U.S. 123 (1908).

Both the Rehabilitation Act and the FMLA have provisions prohibiting employers from retaliating against individuals who engage in protected activity under each statute.[9]  A valid claim for retaliation under either law requires a plaintiff to show that (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the employment action.  *See Solomon v. Vilsack*, 763 F.3d 1, 14 (D.C. Cir. 2014); *Elzeneiny v. D.C.*, 195 F. Supp. 3d 207, 221 (D.D.C. 2016).  Once a plaintiff makes a prima facie showing of retaliation, the burden shifts to the defendant to show a legitimate, nondiscriminatory reason for the adverse action.  *Id*. (internal quotation marks omitted).  "[I]f the defendant can offer a legitimate reason for the challenged action, then district courts may skip over the first step of the analysis."  *Id*. (citing *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)).

---

[9] The Rehabilitation Act incorporates the ADA's standard that prohibits "discriminat[ion] against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  *See* 42 U.S.C. § 12203(a).  The FMLA prohibits "an employer from retaliating against an employee for having exercised or attempting to exercise FMLA rights."  *Thomas v. D.C.*, 227 F. Supp. 3d 88, 99 (D.D.C. 2016) (quoting 29 C.F.R. § 825.220(c)).

Morgan's retaliation claims fail because the defendants have provided a legitimate, non-discriminatory justification for Morgan's termination—that he failed two drug tests—and Morgan has failed to demonstrate that this explanation was pretextual.  Under WMATA's substance abuse policy, if an employee has tested positive in a drug and alcohol test, and the employee has another test with "any detectable level of any intoxicant" within three years from the first offense, the employee will be terminated.  Defs.' Second Motion Re Morgan Ex. I at 6 (WMATA Substance Abuse Policy).

Neither party disputes that Morgan had a previous positive drug and alcohol test result in 2018 when he refused to take a drug and alcohol test altogether.  *See* Defs.' Second Statement of Facts Re Morgan ¶ 31; Morgan's Second Statement of Facts ¶ 31; Defs.' Second Motion Re Morgan Ex. J at 1.  Morgan was required to take another drug and alcohol test after he was granted medical clearance to return to work on October 2, 2019.  *See* Second Espy-Smith Decl. ¶ 9; *id*. Defs.' Second Motion Re Morgan Ex. G (WMATA Drug & Alcohol Policy and Testing Program 7.7.3/6, § 5.02(j)(3)(ii)) ("employees and contractors will not be cleared to perform safety-sensitive functions until" they have "a return to duty drug test with verified negative results" and "an alcohol test with a confirmed negative alcohol concentration of 0.00"); WMATA Substance Abuse Policy at 4 (drug testing shall apply to "any incumbent employees . . . returning to active status in a safety sensitive function).  But Morgan failed to provide an adequate urine sample during the three hours he was allotted under WMATA guidelines.  *See* Defs.' Second Statement of Facts Re Morgan ¶ 10; Morgan's Second Statement of Facts ¶ 10.

Later, Morgan provided WMATA's medical office with a physician's note stating that his ability to urinate was lower due to Furosemide, a diuretic he was taking at the time of the test.

*See* Defs.' Second Statement of Facts Re Morgan ¶ 14; Morgan's Second Statement of Facts ¶ 14.  But Dr. Espy-Smith, the WMATA medical examiner in charge of assessing the test results, sought additional information because she believed that diuretic medication would have caused Morgan to urinate more, not less.  Second Espy-Smith Decl. Re Morgan ¶ 17.  Indeed, in response to Dr. Epsy-Smith's inquiry, Morgan's primary care physician Dr. Wellington told Dr. Espy-Smith that Morgan "had no medical condition that would explain his inability to provide urine," and that his diuretics "should allow him easily to provide a specimen in 3 hours."  Id. ¶ 20; Second Motion Re Morgan Ex. F.  As a result, Morgan failed his second drug and alcohol test within a three-year period, and consistent with WMATA's drug testing policy, he was terminated.

Dr. Epsy-Smith's inquiry was well-founded and in line with Department of Transportation regulations which direct WMATA's medical examiner to "seriously consider and assess," but not necessarily follow, an outside physician's recommendation.  *See* 49 C.F.R. § 40.193.  Because WMATA has provided a legitimate, non-discriminatory reason for terminating Morgan, and he has not shown that the reason was pretextual, the defendants are entitled to summary judgment on this count.

## CONCLUSION

For the foregoing reasons, the defendants' motions to dismiss, or in the alternative, motions for summary judgment are granted.  Accordingly, as to Austin's Amended Complaint, Counts II, III, IV, and the failure to accommodate claim in Count I are dismissed; summary judgment is granted in favor of the defendants on the remaining claim in Count I.  As to Morgan's Amended Complaint, Counts II, III, IV, and the failure to accommodate claim in Count I are dismissed; summary judgment is granted in favor of the defendants on Count VI and the remaining claim in Count I.

DABNEY L. FRIEDRICH
United States District Judge

May 28, 2020